# BOOTH *v.* ILLINOIS.

### ERROR TO THE SUPREME COURT OF THE STATE OF ILLINOIS.

No. 201.   Argued November 6, 1901.—Decided March 3, 1902.

If, looking at all the circumstances which attend, or may ordinarily attend the pursuit of a particular calling, a State thinks that certain admitted evils cannot be successfully reached unless that calling be actually prohibited, the courts cannot interfere unless, looking through mere forms and at the substance of the matter, they can say that the statute, enacted professedly to protect the public morals, has no real or substantial relation to that object, but is a clear, unmistakable infringement of rights secured by the fundamental law.

It must be assumed with regard to section 130 of the Criminal Code of Illinois touching options to sell or buy grain or other property at a future time, that the legislature of the State was of opinion that an effectual mode to suppress gambling grain contracts was to declare illegal all options to sell or buy at a future time; and this court cannot say that the means employed were not appropriate to the end sought to be attained and which it was competent for the State to accomplish.

This court cannot adjudge that the legislature of Illinois transcended the limits of constitutional authority, when it enacted the statute in question.

The case is stated in the opinion of the court.

*Mr. Charles H. Aldrich* for plaintiff in error. *Mr. Lee D. Mathias* was on his brief.

*Mr. Howard J. Hamlin* and *Mr. Elbert S. Smith* for defendant in error.

Mr. Justice Harlan delivered the opinion of the court.

By section 130 of the Criminal Code of Illinois it is provided that " whoever contracts to have or give to himself or another the option to sell or buy, at a future time, any grain, or other commodity, stock of any railroad or other company, or gold, or forestalls the market by spreading false rumors to influence the price of commodities therein, or corners the market, or attempts to do so in relation to any of such commodities, shall be fined not less than ten dollars nor more than one thousand dollars, or confined in the county jail not exceeding one year, or both; and all contracts made in violation of this section shall be considered gambling contracts, and shall be void." Rev. Stat. Ill. Crim. Code, (by Hurd, 1901) § 130.

The defendant was indicted in the Criminal Court of Cook County, Illinois, being charged with violating this statute so far as it related to options to buy grain or other commodities at a future time.

The memorandum of the option purchased by the defendant was as follows:

" B.        Al. V. Booth, grain and provision broker.
10 Weare Com. Co.            Chicago, *Aug.* 16, 1899.
        Sep. corn, 1899.   C., 31½.   Paid.
Good till close of 'change, Sat., Aug. 26, 1899.
                              " Weare C. Co.
                              " J. C. C."

The defendant was found guilty and adjudged to pay a fine of one hundred dollars and the costs of the prosecution.

At the trial, by motions to quash the indictment, in arrest

of judgment, and for a new trial, the accused insisted that the statute under which he was prosecuted was repugnant to that clause of the Fourteenth Amendment of the Constitution of the United States declaring that no State shall " deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws." This contention was overruled both in the trial court and in the Supreme Court of Illinois. 186 Illinois, 43.

There was no dispute as to the meaning of the above memorandum. It meant that on the 16th day of August, 1899, the defendant, a grain and provision broker, and the Weare Commission Company made an agreement whereby, in consideration of the sum of ten dollars paid by Booth, he obtained from the company and was given the option of purchasing from it 10,000 bushels of corn at $31\frac{1}{2}$ cents a bushel—the option to remain good until the close of business on the 26th day of August, 1899.

In *Schneider* v. *Turner*, 130 Illinois, 28, 39, the question was whether the statute embraced an agreement in these words : " Chicago, November 11; 1885. In consideration of one dollar and other valuable considerations, the receipt of which is hereby acknowledged, I hereby agree to sell to George Schneider, Walter L. Peck and Fred W. Peck seventeen hundred and eighty-six shares of the capital stock of the North Chicago City Railway at six hundred dollars per share, if taken on or before the 15th day of December, 1885. V. C. Turner."

It was contended that that agreement was not prohibited by the statute ; that the legislature only intended to make such option contracts unlawful as were gambling contracts, that is, option contracts that did not contemplate the delivery or acceptance of any property and which only required a settlement by " differences ; " whereas, it was insisted, the option there in question had no element of gambling, being only one that entitled the parties obtaining it to elect on or before a named day whether they would buy the stock described in the agreement.

The Supreme Court of Illinois, in that case, observed that at common law all gambling contracts were void, and that an

agreement for the sale of property was a mere wager or gambling contract and void, if made with the understanding of the parties that no property was to be delivered or accepted but could be satisfied by an adjustment simply on the basis of the difference between the contract and the market price. It said : " It must be presumed that the object of the legislature was to declare that unlawful which theretofore had been lawful. Prior to this act it was lawful to have or give an option to sell or buy, at a future time, grain or other commodity. Such contracts were neither void nor voidable at the common law. The statute makes them unlawful or void in Illinois."

That such is the scope and effect of the statute in question was recognized by the Supreme Court of Illinois in the present case. *Booth* v. *People &c.*, 186 Illinois, 43.

Taking the statute to mean what the highest court of the State says it means, is it unconstitutional?

In support of the position that the statute is repugnant to the Fourteenth Amendment, the learned counsel for the plaintiff advance many propositions that meet our entire approval. They cite, as in their judgment controlling, what this court said in *Allgeyer* v. *Louisiana*, 165 U. S. 578, 589, namely, that the liberty mentioned in the Fourteenth Amendment " means not only the right of the citizen to be free from the mere physical restraint of his person, as by incarceration, but the right of the citizen to be free in the enjoyment of all his faculties ; to be free to use them in all lawful ways ; to live and work where he will ; to earn his livelihood by any lawful calling ; to pursue any livelihood or vocation, and for that purpose to enter into all contracts which may be proper, necessary and essential to his carrying out to a successful conclusion the purposes above mentioned."

These declarations state, in condensed form, principles which had been announced in previous cases, and which may be regarded as expressing the deliberate judgment of this court. But those declarations do not, in themselves, determine the question now presented. When it is said that the liberty of the citizen includes freedom to use his faculties " in all lawful ways," and to earn his living by any " lawful calling," the inquiry re-

mains whether the particular calling or the particular way brought in question in a given case is lawful, that is, consistent with such rules of action as have been rightfully prescribed by the State.

It is, however, said that the statute of the State, as interpreted by its highest court, is not directed against gambling contracts relating to the selling or buying of grain or other commodities, but against mere options to sell or buy at a future time without any settlement between the parties upon the basis of differences, and therefore involving no element of gambling. The argument then is, that the statute directly forbids the citizen from pursuing a calling which, in itself, involves no element of immorality, and therefore by such prohibition it invades his liberty as guaranteed by the supreme law of the land. Does this conclusion follow from the premise stated? Is it true that the legislature is without power to forbid or suppress a particular kind of business, where such business, properly and honestly conducted, may not, in itself, be immoral? We think not. A calling may not in itself be immoral, and yet the tendency of what is generally or ordinarily or often done in pursuing that calling may be towards that which is admittedly immoral or pernicious. If, looking at all the circumstances that attend, or which may ordinarily attend, the pursuit of a particular calling, the State thinks that certain admitted evils cannot be successfully reached unless that calling be actually prohibited, the courts cannot interfere, unless, looking through mere forms and at the substance of the matter, they can say that the statute enacted professedly to protect the public morals has no real or substantial relation to that object, but is a clear, unmistakable infringement of rights secured by the fundamental law. *Mugler* v. *Kansas*, 123 U. S. 623, 661; *Minnesota* v. *Barber*, 136 U. S. 313, 320; *Brimmer* v. *Rebman*, 138 U. S. 78; *Voight* v. *Wright*, 141 U. S. 62.

We cannot say from any facts judicially known to the court, or from the evidence in this case, that the prohibition of options to sell grain at a future time has, in itself, no reasonable relation to the suppression of gambling grain contracts in respect of which the parties contemplate only a settlement on the basis

of differences in the contract and market prices.  Perhaps, the legislature thought that dealings in options to sell or buy at a future time, although not always or necessarily gambling, may have the effect to keep out of the market, while the options lasted, the property which is the subject of the options, and thus assist purchasers to establish, for a time, what are known as "corners," whereby the ordinary and regular sales or exchanges of such property, based upon existing prices, may be interfered with and persons who have in fact no grain, and do not care to handle any, enabled to practically control prices. Or, the legislature may have thought that options to sell or buy at a future time were, in their essence, mere speculations in prices and tended to foster a spirit of gambling.  In all this the legislature of the State may have been mistaken.  If so, the mistake was not such as to justify the conclusion that the statute was a mere cover to destroy a particular kind of business not inherently harmful or immoral.  It must be assumed that the legislature was of opinion that an effectual mode to suppress gambling grain contracts was to declare illegal all options to sell or buy at a future time.  The court is unable to say that the means employed were not appropriate to the end sought to be attained and which it was competent for the State to accomplish.

The Supreme Court of the State in this case said : " The practice of gambling on the market prices of grain and other commodities is universally recognized as a pernicious evil, and that the suppression of such evil is within the proper exercise of the police power has been too frequently declared to be open to discussion.  The evil does not consist in contracts for the purchase or sale of grain to be delivered in the future, in which the delivery and acceptance of the grain so contracted for is *bona fide* contemplated and intended by the parties, but in contracts by which the parties intend to secure, not the article contracted for, but the right or privilege of receiving the difference between the contract price and the market price of the article. The object to be accomplished by the legislation under consideration is the suppression of contracts of the latter character, which are in truth mere wagers as to the future market price

of the article or commodity which is the subject-matter of the wager. Clearly a contract which gives to one of the contracting parties a mere privilege to buy corn but does not bind him to accept and pay for it is wanting in the elements of good faith to be found in a contract of purchase and sale where both parties are bound, and offers a more convenient cover and disguise for mere wagers on the price of grain than contracts which create the relation of vendor and vendee. Such contracts are in the nature of wagers, that contracted for being the mere privilege to buy the grain should its market value prove to be greater than the price fixed in the contract for such privilege. The prohibition of the right to enter into contracts which do not contemplate the creation of an obligation on the part of one of the contracting parties to accept and pay for the commodity which is the purported subject-matter of the contract, but only to invest him with the option or privilege to demand, the other contracting party shall deliver him the grain if he desires to purchase it, tends materially to the suppression of the very evil of gambling in grain options which it was the legislative intent to extirpate, for the reason such evil injuriously affected the welfare and safety of the public. The denial of the right to make such contracts tended directly to advance the end the legislature had in view and was not an inappropriate measure of attack on the evil intended to be eradicated. So far as that point is concerned, the act must be deemed a valid law of the land, and as such must be enforced, though it infringe in a degree upon the property rights of citizens. To that extent private right must be deemed secondary to the public good." 186 Illinois, 51.

We are unwilling to declare these views of the state court to be wholly without foundation, and therefore cannot adjudge that the legislature of Illinois transcended the limits of constitutional authority when enacting the statute in question. In reaching this conclusion we have recognized the principle, long established and vital in our constitutional system, that the courts may not strike down an act of legislation as unconstitutional, unless it be plainly and palpably so.

The statute here involved may be unwise. But an unwise

enactment is not necessarily, for that reason, invalid.    It may
be, as suggested by counsel, that the steady, vigorous enforce-
ment of this statute will materially interfere with the handling
or moving of vast amounts of grain in the West which are dis-
posed of by contracts or arrangements made in the Board of
Trade in Chicago.    But those are suggestions for the considera-
tion of the Illinois legislature.    The courts have nothing to do
with the mere policy of legislation.

The judgment of the Supreme Court of Illinois is

*Affirmed.*

MR. JUSTICE BREWER and MR. JUSTICE PECKHAM dissented.