## STATE v. FAIRMONT CREAMERY COMPANY.[1]

February 27, 1925.

No. 24,318.

**Venue in criminal prosecution for discrimination in buying milk.**

1. The venue in a prosecution under L. 1923, c. 120, G. S. 1923, § 3907, forbidding one engaged in the business of buying milk, cream or butterfat for manufacture or for sale from discriminating between different localities by purchasing at a higher price in one locality than he pays in another, due allowance being made for the cost of transportation to the place of manufacture or of sale, may be laid in the county where the lower price is paid.

**No violation of equality clause of Constitutions.**

2. The statute does not violate the equality provision of the Federal or state Constitution.

**No violation of liberty of contract clause of Constitutions.**

3. It does not violate the liberty of contract provision of the Federal or state Constitution.

**No violation of commerce clause of Constitution.**

4. It does not contravene the commerce clause of the Federal Constitution.

*Headnote 1.　See Criminal Law, 16 C. J. p. 186, § 261.

Headnote 2.　See Constitutional Law, 12 C. J. p. 1147, § 878; Monopolies, 27 Cyc. p. 910.

Headnote 3.　See Constitutional Law, 12 C. J. p. 1200, § 966; p. 1281, § 1090.

Headnote 4.　See Commerce, 12 C. J. p. 80, § 107 (1926 Anno).

Defendant was charged in justice court of Cottonwood county with violation of chapter 120, Laws 1923, found guilty and fined $25. From the judgment defendant appealed to the district court for that county where the appeal was heard by Nelson, J., who certified to the supreme court the questions stated near the beginning of the opinion. Affirmed and remanded.

[1]Reported in 202 N. W. 714.

*Hainer & Flansburg, M. S. Hartman, Wilson Borst* and *Charles A. Flinn*, for appellant.

*Cifford L. Hilton*, Attorney General, *Charles E. Phillips*, Assistant Attorney General, and *Ole J. Finstad*, County Attorney, for respondent.

DIBELL, J.

The defendant was convicted before a justice of the peace of Cottonwood county of the violation of L. 1923, p. 120, c. 120, now embodied in G. S. 1923, § 3907, reading as follows:

"Any person, firm, copartnership or corporation engaged in the business of buying milk, cream or butterfat for manufacture or for sale of such milk, cream or butterfat who shall discriminate between different sections, localities, communities or cities of this state, by purchasing such commodity at a higher price or rate in one locality than is paid for the same commodity by said person, firm, copartnership or corporation in another locality, after making due allowance for the difference, if any, in the actual cost of transportation from the locality of purchase to the locality of manufacture or locality of sale of such milk, cream or butterfat, shall be deemed guilty of unfair discrimination, and, upon conviction thereof, shall be punished by a fine not exceeding one hundred dollars, or by imprisonment in the county jail for not exceeding 90 days."

An appeal on questions of law and fact was taken to the district court. The defendant there moved to quash the complaint. The motion was denied and the court certified the following questions:

(1) Whether the venue was properly laid in Cottonwood county.

(2) Whether the statute violates the equality provision of the Federal or state Constitution.

(3) Whether it violates the liberty of contract provision of the Federal or state Constitution.

(4) Whether it contravenes the commerce clause of the Federal Constitution.

1. On June 11, 1923, the defendant purchased cream at Mountain Lake and Bingham Lake in Cottonwood county and at Madelia in Watonwan county. It was shipped to Sioux City, Iowa. The same price was paid at Mountain Lake and Bingham Lake. A higher price was paid at Madelia. The transportation cost from Madelia was greater. Making allowance for the greater cost, the price paid at Madelia was higher than that paid either at Mountain Lake or Bingham Lake by from one to three cents per gallon. The transportation cost, as between Mountain Lake and Bingham Lake, was in favor of the latter, but after making allowance for it the difference in the net price at the two points was but a fraction of a cent per gallon, and perhaps negligible.

The gist of the offense is the discrimination between different localities by paying different prices in different localities after making due allowance for the cost of transportation from the point of purchase to the point of sale or manufacture. The statute chooses to define the offense by referring to a higher price at one point than at another. It might define it by referring to the payment of a lower price at one point than another. The meaning would be the same. The Constitution, art. 1, § 6, provides for a trial in the county or district, previously ascertained by law, where the crime was committed. To constitute an offense there must be two sales at the least, and a sale in each of two different localities. If two sales at points in different counties are compared, there must be an act in each to constitute the offense. The offending fact is that there are sales at different prices and thereby discrimination. The question is not free of difficulty, but we are content to hold that the venue was properly laid in Cottonwood county.

2. The selection of those "engaged in the business of buying milk, cream or butterfat for manufacture or for sale," as the subject matter of the legislation, is claimed to contravene the equal protection clause of the Federal and state Constitutions. That such classification is not subject to constitutional objection was held in State v. Bridgeman & Russell Co. 117 Minn. 186, 134 N. W. 496, Ann. Cas. 1913D, 41, involving the discrimination between different localities in the purchase of dairy products, after proper allowance

for difference in transportation charges, "with the intention of creating a monopoly or destroying the business of a competitor." The statute was amended in 1913, 1917 and 1921, without materially changing the condition quoted. The amendment of 1923 omitted it.

The statute, similar in character, involved and held valid in State v. Standard Oil Co. 111 Minn. 85, 126 N. W. 527; L. 1907, p. 363, c. 269, G. S. 1923, § 10474, was directed against the discrimination between different localities in the selling of petroleum or its products at different prices in different localities" for the purpose of destroying the business of a competitor or creating a monoply in any locality." In State v. Fairmont Creamery Co. 153 Iowa, 702, 133 N. W. 895, 42 L. R. A. (N. S.) 821, a statute similar to that involved in the Bridgeman & Russell Co. case was sustained. In State v. Drayton, 82 Neb. 254, 177 N. W. 768, 23 L. R. A. (N. S.) 1287, 130 Am. St. 671 and State v. Central Lumber Co. 24 S. D. 136, 123 N. W. 504, 42 L. R. A. (N. S.) 804, statutes directed against discrimination between localities for the purpose of destroying the business of a competitor or creating a monopoly, by selling at lower prices any commodities of general use, in the particular cases building material, were sustained.

The equal protection clause does not require that every evil be reached. It is enough that the legislature sees a special evil and directs legislation against it.

In Miller v. Wilson, 236 U. S. 373, 384, 35 Sup. Ct. 342, 345, 59 L. ed. 628, L. R. A. 1915F, 829, the court said:

"It [the legislature] is free to recognize degrees of harm, and it may confine its restrictions to those classes of cases where the need is deemed to be clearest. As has been said, it may 'proceed cautiously, step by step,' and 'if an evil is specially experienced in a particular branch of business' it is not necessary that the prohibition 'should be couched in all-embracing terms.' Carrol v. Greenwich Ins. Co., 199 U. S. 401, 411. If the law presumably hits the evil where it is most felt, it is not to be overthrown because there are other instances to which it might have applied."

What should be done and how it may be done is primarily for the legislature. There are practical considerations of expediency. It

may classify though some inequalities result and must be tolerated. Magoun v. Illinois Trust & S. Bank, 170 U. S. 283, 18 Sup. Ct. 594, 42 L. ed. 1037; Bosley v. McLaughlin, 236 U. S. 385, 35 Sup. Ct. 345, 59 L. ed. 632; Dominion Hotel, Inc. v. Arizona, 249 U. S. 265, 39 Sup. Ct. 273, 63 L. ed. 597; Seamer v. G. N. Ry. Co. 142 Minn. 376, 172 N. W. 765. "There is a strong presumption that a legislature understands and correctly appreciates the needs of its own people, that its laws are directed to problems made manifest by experience, and that its discriminations are based upon adequate grounds. The equal protection clause does not require that state laws shall cover the entire field of proper legislation in a single enactment. If one entertained the view that the act might as well have been extended to other classes of employment, this would not amount to a constitutional objection." Middleton v. Texas P. & L. Co. 249 U. S. 152, 157, 39 Sup. Ct. 227, 229, 63 L. ed. 527. In reviewing this phase of the question in Central Lumber Co. v. South Dakota, 226 U. S. 157, 159, 161, 33 Sup. Ct. 66, 67, 57 L. ed. 164, the court said:

"The subject-matter, like the rest of the criminal law, is under the control of the legislature of South Dakota, by virtue of its general powers, unless the statute conflicts as alleged with the Constitution of the United States. The grounds on which it is said to do so are that it denies the equal protection of the laws, because it affects the conduct of only a particular class—those selling goods in two places in the state—and is intended for the protection of only a particular class—regular established dealers; and also because it unreasonably limits the liberty of people to make such bargains as they like.    *    *    *

"We must assume that the legislature of South Dakota considered that people selling in two places made the prohibited use of their opportunities and that such use was harmful, although the usual efforts of competitors were desired. It might have been argued to the legislature with more force than it can be to us that recoupment in one place of losses in another is merely an instance of financial ability to compete. If the legislature thought that that

particular manifestation of ability usually came from great corporations whose power it deemed excessive and for that reason did more harm than good in their State, and that there was no other case of frequent occurrence where the same could be said, we cannot review their economics or their facts. That the law embodies a widespread conviction appears from the decisions in other States. State v. Drayton, 82 Neb. 254; State v. Standard Oil Co., 111 Minn. 85, 126 N. W. 527; State v. Fairmont Creamery, 153 Iowa, 702, 133 N. W. 895; State v. Bridgeman & Russell Co. 117 Minn. 186, 134 N. W. 496."

The statute does not offend the equal protection clause of either the state or Federal Constitution.

We pass to a consideration of the guaranty of liberty of contract.

There have developed in the state a large number of so-called centralized creameries which buy in different localities. We take it that the defendant is one. In addition there are co-operative creameries and independent creameries not usually maintaining other buying stations, though some may. There is in the law nothing to prevent them doing so. We do not understand that the buying stations are commonly localized plants. Often the buyer represents the creamery as an adjunct of his other business. Often his compensation is through a commission. He may have a place to receive the product or it may be delivered directly to the railroad station. A centralized creamery, supplied with ample capital and facilities, has the ability and meets the temptation to destroy competition at a buying station by overbidding, absorbing the resultant losses, if any, through the profits of its general business and, when competition is ended, to buy on a noncompetitive basis. If it does all this successfully, it has a monopoly, and may or may not treat producers justly. The statute seeks to prevent the destruction of competition by forbidding overbidding unless the dealer makes prices at other buying points correspond after proper allowances for the cost of transportation. If the statute is obeyed destroying competition is expensive.

The statute limits the right of the creamery to contract at its buying points on a basis satisfactory to itself and its patrons. The

state must concede this, and it does. The objection now being considered is that the statute, using the language of the supreme court in reviewing the South Dakota case, "unreasonably limits the liberty of people to make such bargains as they like." And the answer there made was that "as to the statute's depriving the plaintiff in error of its liberty because it forbids a certain class of dealings, we think it enough to say that as the law does not otherwise encounter the Fourteenth Amendment, it is not to be disturbed on this ground." But we are not to forget that in the Minnesota, Iowa, Nebraska and South Dakota cases cited the purpose to create a monopoly or destroy the business of a competitor was an expressed element of the statutory offense, and that the statute before us does not make it so.

The Fourteenth Amendment protects the right of the citizen to engage his faculties in all lawful ways, to pursue any lawful calling, and to such end "to enter into all contracts which may be proper, necessary and essential to his carrying out to a successful conclusion" such purposes. Allgeyer v. Louisiana, 165 U. S. 578, 589, 17 Sup. Ct. 427, 431, 41 L. ed. 832. The liberty of contract is not absolute. "The guaranty of liberty does not withdraw from legislative supervision that wide department of activity which consists of the making of contracts, or deny to government the power to provide restrictive safeguards. Liberty implies the absence of arbitrary restraint, not immunity from reasonable regulations and prohibitions imposed in the interests of the community." C. B. & Q. R. Co. v. McGuire, 219 U. S. 549, 567, 31 Sup. Ct. 259, 262, 55 L. ed. 328. "It is within the undoubted power of government to restrain some individuals from all contracts, as well as all individuals from some contracts." Frisbie v. U. S. 157 U. S. 160, 165, 15 Sup. Ct. 586, 588, 39 L. ed. 657.

In Merrick v. Halsey & Co. 242 U. S. 568, 587, 37 Sup. Ct. 227, 231, 61 L. ed. 498, the court in sustaining the Michigan "Blue Sky Law," which affected and restrained honest contracts which people capable of taking care of themselves wanted to make, said:

"It burdens honest business, it is true, but burdens it only that under its forms dishonest business may not be done.   *   *   *   Ex-

pense may thereby be caused and inconvenience, but to arrest the power of the State by such considerations would make it impotent to discharge its function. It costs something to be governed."

So in the trading stamp cases an analogous interference with the right of contract was sustained. Rast v. Van Deman & Lewis Co. 240 U. S. 342, 36 Sup. Ct. 370, 60 L. ed. 679, L. R. A. 1917A, 421, Ann. Cas. 1917B, 455; Tanner v. Little, 240 U. S. 369, 36 Sup. Ct. 379, 60 L. ed. 691. If the means adopted by the legislature to reach a lawful end are reasonably appropriate courts will not interfere though they are prohibitive of activities otherwise lawful and not in themselves vicious. "It does not follow that because a transaction separately considered is innocuous it may not be included in a prohibition the scope of which is regarded as essential in the legislative judgment to accomplish a purpose within the admitted power of Government. With the wisdom of the exercise of that judgment the court has no concern; and unless it clearly appears that the enactment has no substantial relation to a proper purpose, it cannot be said that the limit of legislative power has been transcended. To hold otherwise would be to substitute judicial opinion of expediency for the will of the legislature, a notion foreign to our constitutional system." Purity Extract Co. v. Lynch, 226 U. S. 192, 201, 33 Sup. Ct. 44, 57 L. ed. 184.

So where a statute forbade options to sell or buy grain or other property at a future time, though actual delivery was intended and the particular contract was not a gambling one, the court in sustaining it in Booth v. Illinois, 184 U. S. 425, 429, 22 Sup. Ct. 425, 427, 16 L. ed. 623, affirming 186 Ill. 43, 57 N. E. 798, 50 L. R. A. 762, 78 Am. St. 229, said:

"The argument then is, that the statute directly forbids the citizen from pursuing a calling which, in itself, involves no element of immorality, and therefore by such prohibition it invades his liberty as guaranteed by the supreme law of the land. Does this conclusion follow from the premise stated? Is it true that the legislature is without power to forbid or suppress a particular kind of business, where such business, properly and honestly conducted, may not, in

itself, be immoral? We think not. A calling may not in itself be immoral, and yet the tendency of what is generally or ordinarily or often done in pursuing that calling may be towards that which is admitedly immoral or pernicious. If, looking at all the circumstances that attend or which may ordinarily attend, the pursuit of a particular calling, the State thinks that certain admitted evils can not be successfully reached unless that calling be actually prohibited, the courts can not interfere, unless, looking through mere forms and at the substance of the matter, they can say that the statute enacted professedly to protect the public morals has no real or substantial relation to that object, but is a clear, unmistakable infringement of rights secured by the fundamental law.

"We cannot say from any facts judicially known to the court, or from the evidence in this case, that the prohibition of options to sell grain at a future time has, in itself, no reasonable relation to the suppression of gambling grain contracts in respect of which the parties contemplate only a settlement on the basis of differences in the contract and market prices."

And in Otis v. Parker, 187 U. S. 606, 609, 23 Sup. Ct. 168, 170, 47 L. ed. 323, involving a constitutional provision of California forbidding the sale of shares of stock on margin, the court affirming 130 Cal. 322, 62 Pac. 571, 927, said:

"Even if the provision before us should seem to us not to have been justified by the circumstances locally existing in California at the time when it was passed, it is shown by its adoption to have expressed a deepseated conviction on the part of the people concerned as to what that policy required. Such a deep-seated conviction is entitled to great respect. If the State thinks that an admitted evil cannot be prevented except by prohibiting a calling or transaction not in itself necessarily objectionable, the courts can not interfere, unless, in looking at the substance of the matter, they can see that it 'is a clear, unmistakable infringement of rights secured by the fundamental law.' Booth v. Illinois, 184 U. S. 425, 429."

The principle that a state may prohibit what is otherwise lawful, and by consequence injuriously affect one in his contract or property rights, for the mere reason that it is necessary to do so in order to exercise effectively a police power, is illustrated in Geer v. Connecticut, 161 U. S. 519, 16 Sup. Ct. 600, 40 L. ed. 793; New York v. Hesterberg, 211 U. S. 31, 29 Sup. Ct. 10, 53 L. ed. 75; State v. Shattuck, 96 Minn. 45, 49, 104 N. W. 719, 6 Ann. Cas. 934.

The statute is directed against discrimination. It is to be assumed that the legislature knew at first hand or obtained adequate knowledge of the facts and conditions surrounding the subject matter of the legislation, justifying the statute, unless we can say that such facts do not exist. It tried for many years a statute requiring as an element of the offense a purpose to combine or stifle competition or create a monopoly. It found the source of unfair competition and resultant monopoly in the buying at different points at different prices. It is not enough that we do not know the facts, or that we disagree with the legislature as to what they are, or that we distrust the policy of the statute. Before we can say that legislation is unconstitutional we must say that facts essential to its validity do not exist. "We said but a few days ago that if a belief of evils is not arbitrary we can not measure their extent against the estimate of the legislature, and there is no impeachment of such estimate in differences of opinion, however strongly sustained. And by evils, it was said, there was not necessarily meant some definite injury but obstacles to a greater public welfare. Nor do the courts have to be sure of the precise reasons for the legislation or certainly know them or be convinced of the wisdom or adequacy of the laws." Armour & Co. v. North Dakota, 240 U. S. 510, 513, 36 Sup. Ct. 440, 60 L. ed. 771, Ann. Cas. 1916D, 548.

"Obviously the question so stated is one of local experience on which this court ought to be very slow to declare that the state legislature was wrong in its facts. If we might trust popular speech in some States it was right—but it is enough that this court has no such knowledge of local conditions as to be able to say that it was manifestly wrong." Patsone v. Pennsylvania, 232 U. S. 138, 144, 34 Sup. Ct. 281, 58 L. ed. 539. The court "cannot run a race of

opinions upon points of right, reason and expediency with the law-making power." Cooley, Const. Lim. (7th ed.) 236. A statute is not constitutional or unconstitutional as it is good or bad, or as it is based on good or bad policy or good or bad economics.

The dairy industry, measured in money, is a large, perhaps just now the largest, productive industry of the state. The production and values in the dairy and other industries are not constant nor is there relative constancy. Statistics of production and values, though carefully used, sometimes mislead, and unfairly used result in a mistaken deduction. Taking those available as accurate and fairly presenting the facts, the value of dairy products annually produced exceeds greatly that of either wheat or corn, the two large staple agricultural products of the state, and perhaps both, exceeds greatly the value of all corn, wheat and other grains and all seeds and vegetables sold on the market from the farms, equals or exceeds the value of all live stock sold from the farms, is many times greater than the value of all the forest products of the state after transportation to the mills and subjected to a process of manufacture, is two and more times as great as the value of the mineral production of the state, and nearly as great or perhaps as great or greater than the gross earnings in the state of all the railroads. It is not surprising that in the marketing of so great a product, coming from so wide an area of production, under conditions such as obtain, those engaged in the industry claim abuses for which they seek legislative remedy. The exercise of the police power is not confined to measures having in view health or morals of the community. The welfare of a great industry and the people engaged in it may be guarded.

In Sligh v. Kirkwood, 237 U. S. 52, 61, 35 Sup. Ct. 501, 59 L. ed. 835, there was sustained a statute of Florida, forbidding the exportation of citrus fruits immature and unfit for consumption. The state was not legislating for the protection of the health of the citizens of the states to which its fruits were exported. Its object was to protect the reputation of its chief industry, the growing of fruits. The court, affirming 65 Fla. 123, 61 South. 185, said:

"We may take judicial notice of the fact that the raising of citrus fruits is one of the great industries of the State of Florida. It was competent for the legislature to find that it was essential for the success of that industry that its reputation be preserved in other states wherein such fruits find their most extensive market. * * * The protection of the State's reputation in foreign markets, with consequent beneficial effect upon a great home industry, may have been within the legislative intent, and it certainly could not be said that this legislation has no reasonable relation to the accomplishment of that purpose."

And in State v. Standard Oil Co. 111 Minn. 85, 96, 126 N. W. 527, 530, we said that "preserving freedom of markets is as important as the prevention of fraud." The Constitution makes unlawful combinations to monopolize the markets for food products or to interfere with or restrict their freedom. Art 4, § 35.

The legislature does not define the constitutional limits of its legislative powers, nor ultimately can it decide them. Within its powers its legislative judgment is supreme, it does not divide its duty with the courts, and to it the courts ascribe competent knowledge. Thayer, Leg. Essays, 27, 28. Nor in determining whether legislation is within the constitutional powers of the legislature do the courts divide their duties with the co-ordinate branch of the government. They cannot abdicate. If the legislature transgresses its constitutional limits the courts must say so, for they must ascertain and apply the law, and a statute not within constitutional limits is not law. "There are, of necessity, limits beyond which legislation cannot rightfully go. While every possible presumption is to be indulged in favor of the validity of a statute, the courts must obey the Constitution rather than the law-making department of government, and must, upon their own responsibility, determine whether, in any particular case, these limits have been passed." Mugler v. Kansas, 123 U. S. 623, 661, 18 Sup. Ct. 273, 297, 31 L. ed. 205. "The powers of the legislature are defined and limited. * * * To what purpose are powers limited * * * if these limits may, at any time, be passed by those intended to be restrained?" Marbury v. Madison, 1 Cranch, 137, 176.

The statute does not offend the liberty of contract guaranty of the Federal or state Constitution.

4. The statute does not in a constitutional sense interfere with interstate commerce. A statute may indirectly or incidentally affect interstate commerce, as local police measures frequently do, without offending the commerce clause.

The defendant relies upon Lemke v. Farmers Grain Co. 258 U. S. 50, 42 Sup. Ct. 244, 66 L. ed. 458. This is the only case it cites. The statute there involved directly affected interstate commerce. There was no wheat market in North Dakota. When the grain started on its way to market it was in the course of interstate commerce. The statute provided a comprehensive scheme to regulate the buying of grain, even to the determination of the permissible margin of profit. The defendant is a Minnesota corporation. The product which it purchased might have gone as well to a point in Minnesota for manufacture or resale. It so happened that it went to Iowa. The statute is not unconstitutional as an interference with interstate commerce. Plumley v. Massachusetts, 155 U. S. 461, 15 Sup. Ct. 154, 39 L. ed. 223; Asbell v. Kansas, 209 U. S. 251, 28 Sup. Ct. 485, 52 L. ed. 778, 14 Ann. Cas. 1101; New York v. Hesterberg, 211 U. S. 31, 29 Sup. Ct. 10, 53, L. ed. 75; Minnesota Rate Cases, 230 U. S. 352, 33 Sup. Ct. 729, 57 L. ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18; Sligh v. Kirkwood, 237 U. S. 52, 35 Sup. Ct. 501, 59 L. ed. 835; Oliver Iron Min. Co. v. Lord, 262 U. S. 172, 43 Sup. Ct. 526, 67 L. ed. 929.

We hold, as did the trial court on the motion to quash, that the venue was properly laid in Cottonwood county, that the statute is not unconstitutional as denying the equal protection of the laws or liberty of contract, or as an interference with interstate commerce. The questions certified are answered accordingly and the case is remanded for further proceedings upon the complaint.

Affirmed and remanded.