Benjamin Gassman, J.
In a two-count information, the defendant is charged with (1) illegal possession of narcotic drugs, and (2) illegal possession of a hypodermic syringe and a hypodermic needle. The defendant moves to dismiss the information on the ground that section 1751-a of the Penal Law *536 (which makes it a misdemeanor to illegally possess narcotic drugs) and section 1747-d (subd. 3) (which makes it a misdemeanor to illegally possess narcotic implements) are both unconstitutional.
In support of his argument that section 1751-a is unconstitutional, defendant cites People v. Hicks (3 A D 2d 829) and People v. Baker (7 A D 2d 707). In the Kicks case, the Appellate Division wrote no opinion, merely stating in its decision that the judgment of conviction of the defendant (on charges of illegal possession of narcotic drugs and narcotic implements) was reversed because “ On neither count was there sufficient evidence to establish each of the elements of the crime.” However, defendant points out that the same court, in the Baker case (supra), in affirming the defendant’s conviction, distinguished it from the Kicks case, stating: “ In Kicks the evidence also indicated that there was- nothing more than a trace of a narcotic in the wad of cotton that was found — insufficient to make a finding that the defendant had possession * * * of a narcotic drug.” It is the defendant’s contention that the evidence in the case at bar consists of a wad of cotton containing but a trace of heroin, and that therefore, the first count in the information should be dismissed on the authority of the Kicks case (supra).
Whether the evidence in the case at bar is similar to that in the Kicks case or whether it is similar to that in the Baker case cannot be decided on a motion in advance of the trial. It must await determination after a trial, when all of the evidence has been submitted. In any event, no constitutional question is presented with respect to count 1, and the motion with respect to that count is denied.
The constitutional attack on count 2, which was framed under subdivision 3 of section 1747-d of the Penal Law, presents a more serious question. That section provides (subd. 3): “It shall be unlawful for any person or persons, except a duly licensed physician, dentist, veterinarian, nurse, podiatrist, hospital, sanitarium or other medical institution, or a resident physician or interne of a hospital, sanitarium or other medical institution, or those engaged in the regular business of dealing in medical, dental or surgical supplies, operating a clinical laboratory, maintaining a registered pharmacy or drug store, or maintaining an undertaking establishment, to have under control or possess, a hypodermic syringe or hypodermic needle, or any .other instrument or implement adapted for the administering of narcotic drugs which other instrument or implement is possessed for that purpose, unless such possession be obtained *537 upon a valid written prescription from, and such use he authorized or directed by, a duly licensed physician or veterinarian. For the purposes of this subdivision no such prescription shall be valid, which has been outstanding for more than one year.”
Defendant argues that the above-cited subdivision is unconstitutional because — whereas possession of any “ other instrument or implement ” is not a crime unless it is proven (a) that it is adapted for the administering of narcotic drugs, and (b) that the defendant possessed it for that purpose — possession of a hypodermic syringe or a hypodermic needle is made a crime without such proof. The statute, according to the defendant, violates his right to due process of law, because he is deprived of the presumption of innocence (Code Grim. Pro., § 389) until proven guilty beyond a reasonable doubt. He urges that this statute is arbitrary and unreasonable and is an abuse of the police power of the State.
Courts of original jurisdiction are reluctant to declare unconstitutional a statute enacted by the Legislature in the exercise of its police power. It is a cardinal principle of construction ‘ ‘ that legislation should not be declared unconstitutional unless it clearly appears to be so; all doubt should be resolved in favor of the constitutionality of an act” (Johnson v. City of New York, 274 N. Y. 411, 430). It is well established that a court of original jurisdiction should never “ declare a law unconstitutional unless ” such conclusion is inescapable (People ex rel. New York Cent. & Hudson Riv. R. R. Co. v. Woodbury, 74 Misc. 130,140).
If the statute upon its face appears to be reasonable and just and appropriate, and if it appears that its natural consequences will be in the direction of the betterment of public health and welfare, it is the duty of the court to pronounce it constitutional. (People v. Klinck Packing Co., 214 N. Y. 121; Holden v. Hardy, 169 U. S. 366, 395.) “ Or to state the rule in converse form, before we can pronounce such a statute * * * unconstitutional, we must be able to see either that there is no real, substantial evil of public interest to be guarded against or that there is no reasonable relation between the evil and the purported cure or prevention offered by the statute.” (People v. Susi, 23 N. Y. S. 2d 812, 818-819; Booth v. Illinois, 184 U. S. 425; Chicago Burlington & Quincy R. R. Co. v. McGuire, 219 U. S. 549.)
It is a matter of common knowledge that drug addiction has become a serious problem, not alone in the City of New York, but throughout the Country. Testimony given before the United States Senate Committee on the Judiciary of the 84th Congress *538 and testimony given before the New York State Joint Legislative Committee on Narcotic Study has established that “ there has been a steady increase in narcotic arrests in New York in the last several years. In 1954, New York City had 4,136 arrests of narcotic violators not previously known to the authorities, 4,400 in 1955 and 4,768 in 1956. In the first nine months of 1957, there were 4,171 narcotic violators arrested. * * * The evidence shows that * * * the number of addicts in New York has grown each year and each year there is a substantial number of new addicts entering the drug user population.” (See Second Interim Report of the State of New York Joint Legislative Committee on Narcotic Study, N. Y. Legis. Doc., 1958, No. 16, p. 15.)
Opium, from which heroin is derived, was introduced in America in the beginning of the 19th century. In 1804, morphine was discovered. A derivative of opium, morphine was twice as toxic, and until 1843, was either chewed, sniffed or smoked. In 1843, with the discovery of the hypodermic needle, addicts began to administer narcotic drugs through intravenous injection. In 1898, a German chemist, Dressen, extracted a derivative from opium and morphine-base, called heroin. Tests have shown that heroin is far more addicting and four times as toxic as morphine.
The Joint Legislative Interim Report discloses that approximately 87 % of the known drug users use heroin, and that there are currently 21,184 drug users in New York City alone, who are known to the authorities. To this number must be added countless numbers not known to the authorities. That report also estimates that 40% of the Country’s entire addict population is in New York City.
As a menace to society the addict not only infects himself but usually introduces others to the habit. The prolonged and continuous use of drugs is a costly practice. It swirls its victims into a maelstrom that flings them from drugs to crime, and then back to drugs again. The addict must have drugs and for lack of funds to pay for them, he turns to crime. Both males and females find themselves involved in thefts, larcenies, prostitution, shop-lifting, burglary, robbery and even murder.
To cope with the spreading narcotic evil, the Congress of the United States, in 1956, increased the penalty for narcotic violators, and the Legislature of the State of New York, in the exercise of its police power, enacted section 1751-a of the Penal Law, and amended the former section 1747-c, by renumbering it as section 1747-d. Subdivision 3 of that section was amended by chapter 692 of the Laws of 1956, and, as quoted above, became effective on April 16, 1956. Though sweeping in their pro *539 visions, they were enacted as a means of combating a vicious evil which engulfed a great many people, including teen-agers. The statute here has a definite relation between the narcotic evil and the purported cure or prevention offered by the statute. While there may be an honest difference of opinion among physicians and sociologists as to whether more stringent laws and longer prison sentences are the proper approach towards the elimination of the narcotic problem, and while there is strong argument in favor of considering and treating the narcotic “ user ” as a sick person rather than a criminal, yet until such time as other provisions are made by law, the courts can do naught but to enforce the law as it stands. There are times when grave problems require radical measures.
The «ordinary individual does not usually carry upon his person either a hypodermic syringe or a hypodermic needle. If he is afflicted with an illness, such as diabetes, which makes it necessary for him to administer unto himself drugs such as insulin, he is not affected by the statute, for he is protected by the fact that such possession was authorized by a physician’s prescription. The Legislature was within its power in making possession without a prescription a crime. Convictions for possession of contraband, without any further proof, were sustained in People v. Adams (176 N. Y. 351) and in Phelps v. Racey (60 N. Y. 10).
In People v. Adams (supra), the Court of Appeals affirmed a conviction under and sustained the constitutionality of section 344a of the Penal Code (now Penal Law, § 974), which created the crime of ‘1 policy ’ ’ gambling and made it unlawful for any person to have in his possession the apparatus therefor. It was argued by the defendant in that case that the section of the Penal Code was “ unconstitutional and void, for the reason that the defendant has been deprived of his liberty * * * without due process of law ” (p. 359). In its opinion, the Court of Appeals said (pp. 359-360): “ Section 344a immediately follows a section of the Penal Code dealing with keeping betting and gambling establishments, and is an amplification of the law looking to the suppression of gambling, it being aimed at the game of ‘ policy,’ so called, which offered an opportunity to the poorer classes of making trifling bets and who could ill afford to lose their small earnings. The papers referred to in section 344a are to be regarded the same as the tools of a burglar or the general gambling apparatus which are dealt with in the Penal Code. * * * We are of the opinion that this section is constitutional.”
*540 In Phelps v. Racey (60 N. Y. 10, supra), an appeal was taken from a conviction under section 7 of chapter 721 of the Laws of 1871, which provided in part that 1 ‘ No person shall * * * have in his * * * possession after the same has been killed, any quail, between the first day of January and the twentieth day of October, under a penalty of twenty-five dollars”. In that case, as in the case at bar, mere possession of the prohibited game birds constituted the offense, and was not merely “ presumptive evidence ’ ’ of such offense. The Court of Appeals, in sustaining the constitutionality of the statute said: “ The legislature may pass many laws the effect of which may be to impair or even destroy the right of property. Private interest must yield to the public advantage ” (p. 14). “ The mandate is that ‘ any person having in his or her possession,’ between certain dates, certain specified game killed, shall be liable to a penalty ” (p. 13). “ It is quite evident # * * that the act in question does not violate the Constitution of the United States ” (p. 15).
Defendant argues that section 1747-d (subd. 3) of the Penal Law is unconstitutional because it ‘ ‘ has no provision which excepts those people who have possessed such instruments prior to the statute’s enactment, and continue to possess them”. Precisely the same question was raised in the Racey case (supra), and the court held that (p. 13): “ It is a familiar rule that when the language is clear courts have no discretion but to adopt the meaning which it imports. * * * The time when or the place where the game was killed, or when brought within the State * * * is not made material by the statute, and we have no power to make it so.”
Subdivision 3 of section 1747-d makes possession without a “ prescription ”, of a hypodermic syringe or hypodermic needle, by anyone not specifically excepted, illegal, as of April 16, 1956. The question of whether it was legal prior to that date does not enter into the determination of whether the section is constitutional. The Legislature had the power to declare, as it did, that on and after April 16, 1956, such possession is illegal.
Defendant argues that the law cannot interfere with a person’s possession of implements used for subcutaneous injection of narcotic drugs, merely because they may also be used for other— or legal — purposes. The statute does not absolutely prohibit one from possessing a hypodermic syringe or needle. ¡Recognizing that there is need to protect the public against the indiscriminate possession of such implements by those addicted to narcotic drugs, it provides that only he, who has a prescription less than one year old, or is one of the class excepted in that subdivision, may legally possess such implements. Possession *541 by others is declared a misdemeanor. Certainly it cannot be said that such provisions are arbitrary or that they deprive anyone of his lawful rights. “ The rights of the individual are not absolute. They are subject to the exercise of the regulatory powers of government. The State may enact laws regulating, restraining and prohibiting, although such regulation, restraint or prohibition interferes with, curtails or diminishes personal rights ” (People y. Brown, 175 Misc. 989, 993, affd. 287 N. Y. 154).
That the Legislature had cause to become alarmed at the increased number of narcotic addicts, there can be no question. It was therefore concerned with the effect that such addiction had on the public health and welfare and enacted the statutes in question as part of the police power of the State. ‘ ‘ In determining whether statutory requirements are arbitrary, unreasonable or discriminatory, it must be borne in mind that the choice of measures is for the legislature, who are presumed to have investigated the subject, and to have acted with reason, not from caprice. Legislation passed in the exercise of the police power must be reasonable in the sense that it must be based on reason as distinct from being wholly arbitrary or capricious, but when the legislature has power to legislate on a subject, the courts may only look into its enactment far enough to see whether it is in any view adapted to the end intended. If it is, the court must give it effect, however unwise they may regard it, or however much they might, if given the choice, prefer some other measure as more fit and appropriate ’ ’ (People v. Griswold, 213 N. Y. 92, 96-97).
We accordingly hold that the statute is constitutional. The motion of the defendant should be, in all respects denied.
Acquavella, P. J., and Rao, J., concur.
Motion denied, etc.