FINISH LINE EXPRESS, INC., *et al.*, Plaintiffs-Appellants, *v.* THE CITY OF CHICAGO *et al.*, Defendants-Appellees.

First District (4th Division)    Nos. 77-1029, 77-1031, 77-1034, 77-1048, 77-1110, 77-1142, 77-1152, 77-1539, 77-1634 cons.

Opinion filed April 20, 1978.

ROMITI, J., specially concurring.

Feiwell, Galper & Lasky, Ltd., Block, Levy & Becker, Silverstein & Stein, Albert Brooks Friedman, Morton L. Zaslavsky, and David E. Feldman, all of

Chicago (George S. Feiwell, Michael A. Braun, Daniel C. Meenan, Jr., Alvin R. Becker, Edward A. Scott, III, and Michael G. Stein, of counsel), for appellants.

William J. Scott, Attorney General, Bernard Carey, State's Attorney, and William R. Quinlan, Corporation Counsel, all of Chicago (William Perlman, Assistant Attorney General, John Dienier, Assistant State's Attorney, and Jerome Siegan, Assistant Corporation Counsel, of counsel), for appellees.

Carey, Filter & White, of Chicago (Edward M. White, of counsel), for *amici curiae*.

Mr. PRESIDING JUSTICE JOHNSON delivered the opinion of the court:

This is a case of first impression in the State of Illinois. The plaintiffs-appellants are corporations chartered by the State of Illinois to act as agents for the delivery of monies to be bet in parimutuel facilities established in accordance with the Illinois Horse Racing Act of 1975 (Ill. Rev. Stat. 1977, ch. 8, par. 37—1 *et seq.*). In June 1977, the Illinois legislature amended the Illinois Horse Racing Act by the addition of section 39.1, which provides:

> "(a) No person shall, for a fee, directly or indirectly, accept anything of value from another to be transmitted or delivered for wager in any pari-mutuel or certificate system of wagering on horse races. Nothing in this Section prohibits wagering transactions authorized under this Act.
> 
> (b) Any person who violates this Section is guilty of a Class 4 felony." Ill. Rev. Stat. 1977, ch. 8, par. 37—39.1.

The plaintiffs-appellants commenced this action in the circuit court of Cook County for declaratory relief, injunction, return of property, and money damages. After the amendment to the statute, they included a count challenging the constitutionality of the amendment, *i.e.*, section 39.1. The trial court granted the defendants' motion to dismiss the complaint for failure to state a cause of action. The plaintiffs-appellants are appealing from the decision of the trial court to dismiss their complaint for failure to state a cause of action.

The sole issue raised on review is whether or not the amendment to the Illinois Horse Racing Act as embodied in section 39.1 is unconstitutional, in that the right of plaintiffs to engage in business is unconstitutionally restrained unreasonably and without a proper nexus to a legitimate State need.

■■ The law in Illinois is well settled on the subject of when the legislature may interfere in the conduct of business:

> "It is a fundamental and well-established rule, both in the United

States courts and in the courts of this State, as a firmly settled constitutional principle, that every citizen is guaranteed the right to engage in any lawful, useful and harmless business or trade, and it is not within the constitutional authority of the State legislature, in the exercise of police power, to interfere with the rights of the individual to carry on a legitimate business, where no interest of the public safety, welfare or morals is damaged or threatened. (*Scully v. Hallihan,* 365 Ill. 185; *People v. Carolene Products Co.* 345 Ill. 166; *Banghart v. Walsh,* 339 Ill. 132; *New State Ice Co. v. Liebmann,* 285 U.S. 262; *Weaver v. Palmer* [*Bros. Co.*], 270 U.S. 402.)" *People ex rel. Barrett v. Thillens* (1948), 400 Ill. 224, 232, 79 N.E.2d 609, 613.

■■  Our supreme court has also discussed the concept of liberty and due process with regard to the authority of the legislature to interfere with the conduct of business. In *People v. Brown* (1950), 407 Ill. 565, 95 N.E.2d 888, the supreme court stated:

"Section 1 of article II of the State constitution declares all men have certain inherent and inalienable rights, three of them being the right to life, the right to liberty and the right to pursue happiness. Section 2 of the same article declares none of the three named rights, plus the right of property, shall be taken from a person except by due process of law, *i.e.,* the law of the land. A person's business, profession, trade, occupation, labor, and the avails from each constitute 'property' envisioned in the two sections. The right to follow any of those activities is 'liberty' as also envisioned therein. Those rights guaranteed by the constitution are not unqualified rights to be exercised regardless of harm to others at all times or places. There must be a yielding, partially or wholly, thereof for the common good of society when the State so commands through the rightful use of its inherent police power to secure either the public health, morals, safety, comfort or common welfare.

That power is great and reaches far, but its use is hedged with restrictions. * * * The legislature cannot enact a lawful statute by invoking the police power on the pretense of protecting public interests when the actual objective of the statute constitutes an arbitrary interference with private business, or imposes unusual and unnecessary restrictions upon lawful occupations; if such statute does not tend to preserve the public health, safety or welfare, it is void as an invasion of individual property rights. *People v. Carolene Products Co.* 345 Ill. 166." *Brown,* at 572-73.

The Attorney General and the brief for the amici curiae continually refer to the business of the plaintiffs as being gambling. We think it would

be instructive to examine the contract between one of the businesses and its customers. The contract between plaintiff Finish Line and its customers reads as follows:

"I herewith appoint any person provided by Finish Line Express, Inc. to act as my attorney-in-fact in purchasing parimutuel tickets for me, as indicated at the left. I do so subject to the terms and conditions on the reverse side thereof. I direct my agent:

Redeem my parimutuel tickets.

DO NOT redeem my parimutuel tickets, Form B required.

I authorize and direct Finish Line to deliver money or property, with Form B, accruing hereunder to the bearer of this receipt upon demand.

FINISH LINE EXPRESS, INC. a corporation chartered under the laws of the State of Illinois, provides attorneys-in-fact (herein referred to as agents) for appointment by individual principals, who confer upon such agents the power to purchase parimutuel tickets for such empowering principal to the extent that such principal can himself lawfully make such purchase. An agent, if empowered to redeem parimutuel tickets for this principal, will do so when the principal could himself lawfully redeem.

Money paid to Finish Line does not constitute a bet or wager. When tendered to Finish Line by a principal, Finish Line will provide an agent to be empowered by that principal to place such money in the parimutuel pool (designated on the reverse hereof) of any enclosed race track which is licensed by the Illinois Racing Commission to conduct race meetings.

In consideration for providing an agent, Finish Line, Inc. charges the principal a fee of 10% of the cost of any parimutuel ticket purchased. Said fee is payable regardless of the outcome of the event to which a ticket relates. Neither Finish Line nor any agent provided by Finish Line shall be entitled to further compensation, unless the principal desires to have his tickets returned and unredeemed—tickets will be cataloged, filed and stored in Finish Line's vault for safekeeping for a period of ninety (90) days. Principal agrees to pay an additional fee of 5% for this service and also agrees at time of paying money to request and execute Form B, to be provided by Finish Line, said Form B becomes a part of and a rider to this contract.

In case of late scratches, all money will be returned to principal less the 10% fee. In case of early scratches, all money will be returned to principal.

Scratch of part of entry does not revoke the agent's authority to purchase parimutuel tickets on the remaining part of such entry.

Notwithstanding any other representation herein, agents provided by Finish Line will not redeem any parimutuel ticket where redemption is conditioned upon identification by the holder of such ticket. In such case, the agent will deliver the redeemable ticket to Finish Line for delivery to the principal.

A parimutuel ticket which is not redeemed will be returned to the holder of this receipt when Form B is properly executed and attached to this receipt and returned with same.

Redemption of this receipt must be made within 14 days of issue. If executed together with Form B and payment of additional 5% fee, tickets will be cataloged, filed and stored for 90 days from date of purchase. Redeemable tickets held by Finish Line will be redeemed by Finish Line upon the expiration of such 90 day period. Whenever and wherever possible principal authorizes Finish Line to consolidate these selections on the reverse side of this contract with any and all other identical selections on other contracts. To purchase parimutuel tickets of higher denomination, principal will retain equitable share, to redeem same and return proceeds as provided above—this however does not apply when Form B has been executed and attached hereto—where identification is necessary any one person by agreement can assume responsibility for redeeming same if agreeable with race track management or any local-state or federal taxing agent or employee.

Neither Finish Line nor any agent provided by Finish Line warrants performance hereunder, or assumes liability for default by either, caused by circumstances over which neither Finish Line nor such agent has control (e.g., traffic delays, robbery, incorrect posting, incorrect recapping, incorrect conversion, or any * * * [mal]function of totalizer equipment or any and all delays caused by race track equipment personnel or patrons fights or disorders, etc.). Where performance by agents is frustrated in consequence of such events, a principal shall be entitled to a refund of all money. Such refund shall be deemed liquidated damages, and principal shall not be entitled to any further damages or compensation."

■■ It is clear from the foregoing that plaintiffs are engaged in the business of providing a service to their customers not unlike any other messenger service. This court will take judicial notice of the fact that in the yellow pages of the city of Chicago there are some 40 different messenger services which engage in a wide variety of services. (*Sunga v. Lee* (1957), 13 Ill. App. 2d 76, 84, 141 N.E.2d 63, 67.) Some of these

services limit themselves to the Loop; some will deliver anything anywhere in the world. Many of these services advertise they are bonded and will handle valuable shipments. The plaintiffs have merely undertaken to provide a service, heretofore not in existence, as messengers to certain specific locations. The briefs for the Attorney General and amici curiae misconstrue the activities of the plaintiffs and are not well taken. The fact the plaintiffs herein undertake to carry cash for a customer is not a new and novel undertaking for a messenger service. For many years there have been a number of armored car services as well as bank check services which daily carry cash and negotiable instruments throughout the metropolitan area, as well as all over the state and the nation. The legislature has seen fit to regulate these activities, not to abolish them.

■■ It is within the power of the legislature to regulate and to tax the plaintiffs. As the supreme court stated in *Figura v. Cummins* (1954), 4 Ill. 2d 44, 51, 122 N.E.2d 162, 166, citing *People ex rel. Barrett v. Thillens* (1948), 400 Ill. 224, 234-35, 79 N.E.2d 609, 614:

> "Where, in any business, elements of harm, injury or detriment to public welfare or safety of the public appear, requiring regulation for the public good, such elements of harm may be the proper ground for reasonable regulation, but they are not ground for a complete suppression and prohibition of the business, which in itself is innocent and harmless."

■■■ Furthermore, through the Horse Racing Act of 1975 (Ill. Rev. Stat. 1977, ch. 8, par. 37—1 *et seq.*) as well as the Illinois Lottery Law (Ill. Rev. Stat. 1975, ch. 120, par. 1151 *et seq.*), it cannot be contended by the State that the public policy of this State is to completely prohibit gambling. Rather, we think it is now public policy of this State to allow wagering under the supervision of the State, where the State is able to tax and regulate the wagering. As was the opinion of the supreme court in *Figura,* the proper remedy for the legislature would be to regulate the activities of these messenger services to be sure they operate within the framework of the Illinois Horse Racing Act, not to prohibit their operation.

We note with interest and approval the opinion of the Louisiana Supreme Court in *State v. Countdown, Inc.* (La. 1975), 319 So. 2d 924. There, the State had contended the operation of these messenger services constituted offtrack betting. The court in its opinion said:

> "Nor is there any merit to the State's contention that Countdown's operation constitutes betting at an off-track site prohibited by R.S. 4:149 and 171. Countdown did not bet or wager. It accepted money, carried to the track, placed the bet at pari-mutuel windows and returned the betting ticket to its office, to be retrieved by the bettor. It takes two to wager, and until

Countdown reached the track with the bettor's money and bought the ticket at the parimutuel window, no bet was made." *Countdown,* at 927.

Accordingly, for the reasons contained herein, we hold the statute in question here to be unconstitutional, and the judgment of the circuit court of Cook County is reversed.

Reversed.

DIERINGER, J., concurs.

Mr. JUSTICE ROMITI, specially concurring:

I concur in this decision but only to the extent that it indicates the need for an authoritative determination of the public policy of this State concerning gambling.

The power of the legislature to regulate and even prohibit gambling activities has long been recognized in Illinois. (*Booth v. People* (1900), 186 Ill. 43, 57 N.E. 798, *aff'd* (1902), 184 U.S. 425, 46 L. Ed. 623, 22 S. Ct. 425; *People v. Monroe* (1932), 349 Ill. 270, 182 N.E. 439.) These restrictions have been based on the police power of the State, out of which the legislature derives broad discretion in regulating matters related to the public welfare. But this discretion is not unbounded; it must be exercised reasonably. *Rios v. Jones* (1976), 63 Ill. 2d 488, 348 N.E.2d 825, *appeal dismissed* (1976), 429 U.S. 934, 50 L. Ed. 2d 304, 97 S. Ct. 346; *Sherman-Reynolds, Inc. v. Mahin* (1970), 47 Ill. 2d 323, 265 N.E.2d 640.

Whether such statutes, enacted pursuant to the police power, are in fact substantially related to the public welfare and whether the means utilized are reasonable are both questions properly reviewable by the courts. *Brennan v. Illinois Racing Board* (1969), 42 Ill. 352, 247 N.E.2d 881.

In *People v. Monroe* our supreme court held that betting on horse races was not *malum in se,* but only *malum prohibitum.* At issue there was the constitutionality of legislation permitting betting on horse races. But that case makes clear that there is nothing immutable about the public policy against gambling. As the court there stated: "The public policy of a State, when not fixed by the constitution, is not unalterable but varies upon any given question with changing legislation thereon* * *." (349 Ill. 270, 276, 182 N.E. 439, 442.) For some time Illinois has permitted betting on horse races, though limiting the manner in which this could be done. (Ill. Rev. Stat. 1977, ch. 8, par. 37a *et seq.*) More recently, by legislation creating a State lottery, this State has become actively involved in fostering a gambling activity throughout the State. (Ill. Rev. Stat. 1977, ch. 120, par. 1151 *et seq.*) We also take judicial notice that a Governor's commission has recommended that offtrack betting be legalized in this State and

administered by regional offices in Chicago and other "core" cities throughout the State; and of recent news media reports suggesting the imminence of such legislation.

At issue, then, is whether the legislature may reasonably prohibit a private commercial form of an activity by declaring it to be contrary to public policy or harmful to the general welfare while by other legislation it actively promotes that activity. If it may not, under the standards of review utilized in Illinois for determining the propriety of restrictions on business activity, as set out in the opinion of the court, it seems clear that the prohibition at issue is unreasonable.[1] Thus it becomes crucial to decide whether gambling, and horse racing in particular, when viewed against this backdrop of recent and proposed legislation is no longer contrary to the public policy of Illinois, and therefore has become subject to the protections afforded other commercial enterprises. Because I believe the decision of this court will aid in establishing with finality the public policy in this area, I concur in that decision.

---

[1] Such a determination, of course, would not interfere with the State's authority to reasonably regulate and monitor such activities so as to prevent abuses.