**KELLEHER v. SCHOENE, State Entomologist.**

(District Court, W. D. Virginia. July 22, 1926.)

1. **Agriculture ⬦1—Where Cedar Rust Law Va. was adopted in district, readoption after amendment held unnecessary (Code, Va. 1919, §§ 885–893; Acts 1920, c. 260).**

Where Cedar Rust Law Va. (Code 1919, §§ 885–893), which was to be effective only in counties or districts adopting it, was adopted in a district, readoption of the statute after its amendment by Acts 1920, c. 260, was not necessary to make the amendment effective in that district.

2. **Agriculture ⬦9½—Cedar Rust Law Va., as originally enacted, held applicable to trees within two miles of apple orchard (Code Va. 1919, §§ 885–893; Acts 1920, c. 260)..**

Cedar Rust Law Va. (Code 1919, §§ 885–893), as originally enacted, held intended to apply to cedar trees within two miles of apple orchards; the reference to trees within one mile of orchard in section 885, prior to amendment by Acts 1920, c. 260, being a clerical error.

3. **Constitutional law ⬦278(1)—Cedar Rust Law Va. held not to deny due process of law because of provision for petition by freeholders (Code Va. 1919, §§ 885–893).**

Cedar Rust Law Va. (Code 1919, §§ 885–893), authorizing the state entomologist to order destruction of infected cedar trees, held

not unconstitutional as depriving an owner of trees of his property without due process of law, because a petition of freeholders was a condition precedent to investigation and action by the state entomologist; his action, beyond investigation, being in no manner controlled by the petition.

4. **Statutes ⬦47—Cedar Rust Law Va. held not invalid for indefiniteness; "locality from which said request is received" (Code Va. 1919, §§ 885–893).**

The Cedar Rust Law Va. (Code 1919, §§ 885–893), requiring the state entomologist, on written request of ten freeholders of any county or magisterial district, to make an investigation of the "locality from which said request is received," is not invalid for indefiniteness of the word "locality," as the quoted phrase means the locality to which the request relates, and the request should describe the lands to be examined or the orchards within two miles of which lands are to be examined with accuracy and certainty.

5. **Agriculture ⬦1—Virginia Cedar Rust Law held within police power and constitutional (Code Va. 1919, §§ 885–893).**

Cedar Rust Law Va. (Code 1919, §§ 885–893), requiring destruction of infected cedar trees within a radius of two miles from any apple orchard, held constitutional within the police power of the state, the evidence showing that, while the rust is not injurious to the cedar trees, it is communicated to apple trees within a distance of two miles and destroys the same.

6. **Constitutional law ⬦211.**

The Cedar Rust Law Va. (Code 1919, §§ 885–893), the operation of which will be of general benefit to the public, is not unconstitutional as denying the equal protection of the laws because its direct effect is to benefit one class of property owners at the expense of another.

7. **Constitutional law ⬦48.**

Courts have no power to declare a statute unconstitutional unless it is clearly so.

In Equity. Suit by Daniel Kelleher against W. J. Schoene, State Entomologist. On motions for preliminary injunction and by defendant to dismiss. Both motions denied.

Randolph Harrison, of Lynchburg, Va. (Harrison, Long & Williams, of Lynchburg, Va., on the brief), D. O. Dechert, of Harrisonburg, Va., and M. L. Walton, Jr., of Woodstock, Va., for plaintiff.

F. S. Tavenner, of Woodstock, Va., and Geo. N. Conrad, of Harrisonburg, Va., for defendant.

Before PARKER, Circuit Judge, and McDOWELL and GRONER, District Judges.

McDOWELL, District Judge. This is a suit in equity, commenced January 18, 1926,

in which the plaintiff seeks to have the state entomologist enjoined from enforcing the Virginia Cedar Rust Law.

### The Statute.

The original statute of March 4, 1914, c. 36 (Va. Acts 1914, p. 49), was copied into the Code of 1919, with the addition merely of section headings and section numbers. Unfortunately some of the questions which must be discussed are of such nature that it is advisable to here insert the provisions of the statute verbatim.

"Sec. 885. *Red Cedar Trees; Declared Public Nuisance, When.*—It shall hereafter be unlawful within this state for any person, firm or corporation to own, or keep alive and standing upon his or its premises, any red cedar tree, or trees (which are or may be) the source, harbor or host plant for the communicable plant disease commonly known as 'orange' or 'cedar rust,' of the apple, and any such cedar trees, when growing within a radius of one mile of any apple orchard in this state, are hereby declared a public nuisance and shall be destroyed as hereinafter provided, and it shall be the duty of the owner or owners of any such cedar trees to destroy the same as soon as they are directed to do so by the state entomologist, as hereinafter provided. (1914, p. 49.)

"Sec. 886. *Investigations by State Entomologist; When Trees to be Destroyed; Notice to Owner.*—In any county in this state where the above-mentioned disease exists, or there is reason to believe it exists, it shall be the duty of the state entomologist, in person or by an assistant, upon the request in writing of ten or more reputable freeholders of any county or magisterial district, to make a preliminary investigation of the locality from which said request is received, to ascertain if any cedar tree or trees in said locality are the source of, harbor or constitute the host plant for the said disease known as 'orange' or 'cedar rust' of the apple, and constitute a menace to the health of any apple orchard in said locality, and that said cedar tree or trees exist within a radius of two miles of any apple orchard in said locality. If upon such preliminary investigation of the localities from which said request is received it shall appear that there are cedar trees which constitute the source, harbor or host plant of said disease, and that said cedar tree or trees exist within a radius of two miles of any apple orchard or orchards in said locality and constitute a menace to the health of said apple orchard or orchards, the state entomologist or his assistant, shall

give notice in writing to the owner or owners of said cedar tree or trees to destroy the same; such notice shall contain a brief statement of the fact found to exist whereby it is deemed necessary or proper to destroy said cedar trees and call attention to the law under which it is proposed to destroy said cedar trees, and the owner or owners shall within such time as may be prescribed in such notice by the state entomologist cut down and destroy said cedar trees. (Id.)

"Sec. 887. *When Certain Trees May be Treated to Render Them Harmless.*—If, however, in the judgment of the state entomologist it is practical to treat any such cedar tree or trees, especially ornamental trees in dooryards, graveyards, cemeteries and parks, which have been declared as aforesaid to constitute a menace to any apple orchard in said locality, in such a way as to render it or them harmless, he may direct such treatment to be carried out by the owner under the direction of any agent he may appoint for that purpose. Said directions for treatment shall be put in writing by the state entomologist and a copy placed in the hands of said owner. Any owner undertaking to so treat his trees and refusing or failing to carry out said written directions shall be guilty of a misdemeanor and upon conviction thereof shall be fined not less than five dollars nor more than fifty dollars. (Id.)

"Sec. 888. *Upon Whom Notice Served.*—The notice required under sections eight hundred and eighty-six and eight hundred and eighty-nine may be served upon the owner of said trees if a resident of the state in the manner prescribed by section six thousand and forty-one, or if such owner be not a resident of this state, by serving a copy of such notice upon his tenant or other person having charge of the premises. (Id.)

"Sec. 889. *When State Entomologist to Destroy Trees.*—Whenever the owner or owners of said cedar tree or trees refuse or neglect to cut down or destroy the same within the time specified in the notice given by the state entomologist as prescribed by section eight hundred and eighty-six, it shall be the duty of the state entomologist to cause said trees to be at once cut down or destroyed and the necessary expense thereof shall be paid by his warrant on the county treasurer to be paid out of the general fund of the county and to be reimbursed as provided in section eight hundred and ninety-two. (Id.)

"Sec. 890. *Entry upon Premises by State Entomologist; Penalty for Hindering or Obstructing Him.*—The state entomologist, his assistant or employees are empow-

ered with authority to enter upon any public or private premises for the purpose of carrying out the provisions of this chapter. Any person or persons who shall obstruct or hinder the said entomologist, his assistants or employees in the discharge of their duties under this chapter shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined not less than five dollars nor more than fifty dollars. (Id.)

"Sec. 891. *Appeal from Order of State Entomologist; Damages Paid by County Treasurer.*—Any owner finding objection to the order of the state entomologist in requiring him to destroy his cedar tree or trees may appeal from said order to the circuit court of the county in which said trees are located, but said appeal must be taken within fifteen days from the date upon which the notice to destroy the same is served upon him. Notice in writing of said appeal must be filed with the clerk of said court who shall forthwith transmit a copy thereof to the state entomologist. The filing of said notice shall act as a stay of the proceedings of the state entomologist until it is heard and decided. The court in regular or special session shall thereupon hear the objections, and is hereby authorized to pass upon all questions involved, and determine the amount of damages, if any, which will be incurred by the owner in case said trees are destroyed, and the costs incurred or to be incurred in cutting down trees under section eight hundred and eighty-six. If the court should find any damages or such expense sustained, he shall order the amount so ascertained to be paid to the owner by the treasurer of the county out of the general fund of said county, and such order shall be entered by the clerk in the law order book of the said court. (Id.)

"Sec. 892. *Levy upon Apple Orchards to Reimburse County.*— Whenever the court orders any damages paid out of the general fund of the county under the preceding section or such amount as the county treasurer may have paid out of the general fund of the county under section eight hundred and eighty-nine, the said county fund shall be reimbursed by a specific levy of not exceeding one dollar per acre on all apple orchards planted ten years or more, and not exceeding fifty cents per acre on all orchards planted more than two years and less than ten years, in each magisterial district in which this law shall have become operative as hereinafter provided. The court awarding damages shall direct the commissioner of the revenue for the district or districts in which the law has become operative to report at the next annual assessment the names of all owners of apple orchards, over two years old and less than ten years old and all owners of apple orchards over ten years old in each district or districts together with the number of acres of orchards owned by each person.

"The court shall thereupon fix such specific amount per acre to be paid by each such owner as will in the aggregate net the amount necessary to reimburse the county fund for all damages and costs previously paid out under the provisions hereof.

"The court shall enter an order directing each owner to pay his respective portion so ascertained, to the county treasurer, which said order shall have the full force and effect of a judgment of the court; if said amounts are not paid within thirty days from the date of said order the county treasurer shall proceed to collect the same as delinquent taxes are collected; provided, however, that all damages awarded and assessments made therefor shall be by magisterial districts, each district bearing its own expenses in the enforcement of this chapter.

"The amount fixed by the court upon orchards planted more than two and less than ten years shall be one-half the amount fixed by the court as a charge upon orchards planted ten years or more. (Id.)

"Sec. 893. *How the Eight Preceding Sections Put in Force in Counties and Magisterial Districts.*—The eight preceding sections shall not be in force in any county or in any magisterial district of any county until the board of supervisors thereof shall by a recorded vote accept and adopt the same for their county or magisterial district in their county, and such acceptance and adoption shall not make the same operative unless the circuit court of such county by an order duly entered shall ratify and approve the action of the board.

"In the event the board of supervisors of any county neglect or refuse to accept and adopt the same for their county, or for any magisterial district of their county, then the majority of the qualified voters of said county or any magisterial district of said county, may request its adoption by petition addressed to the circuit court of said county, and when it appears from said petition that a majority of the qualified voters of said county or any magisterial district of said county request the adoption of said sections, then the said court shall declare the same adopted for such county, or for any magis-

terial district in such county, requesting their adoption. (Id.) "

By Act of March 16, 1920 (Acts 1920, p. 370), the first section of the original statute was amended. It reads in part:

"Be it enacted by the General Assembly of Virginia, that section eight hundred and eighty-five of the Code of Virginia be amended and re-enacted so as to read as follows." Then follows an exact copy of the original section, except that the words "two miles" are substituted for the words "one mile" in the original. The foregoing is the whole of the amending act, which is entitled, "An act to amend and re-enact section 885 of the Code of Virginia."

On March 10, 1922 (Acts 1922, p. 246), section 892 of the original act was amended and re-enacted. The amendatory act, like the original section, relates solely to the reimbursement of counties for expenditures made in the destruction of cedar trees.

On February 26, 1924 (Acts 1924, p. 47), section 889 of the original act was amended and re-enacted as follows:

"Be it enacted by the General Assembly of Virginia, that section eight hundred and eighty-nine of the Code of Virginia be amended and re-enacted so as to read as follows:

"Sec. 889. *When State Entomologist to Destroy Trees and Sprouts.*—Whenever the owner or owners of said cedar tree or trees refuse or neglect to cut down or destroy the same within the time specified in the notice given by the state entomologist as prescribed by section eight hundred and eighty-six, it shall be the duty of the state entomologist to cause said trees to be at once cut down or destroyed · and the necessary expense thereof shall be paid by his warrant on the county treasurer to be paid out of the general funds of the county and to be reimbursed as provided in section eight hundred and ninety-two.

"On petition of ten or more reputable freeholders in any county or magisterial district in which this law has been made operative as provided in section eight hundred and ninety-three, the state entomologist may arrange for the removal of cedar sprouts on land from which the cedars have already been removed, the necessary expense thereof being paid by his warrant on the county treasurer as provided above without the formality of serving a legal notice on the owner of the land.

"2. An emergency existing, this act shall be in force from its passage."

### The Bill.

The bill alleges all necessary jurisdictional facts. In it are allegations which, if true, show that the plaintiff has been made the victim of vexatious litigation instituted by the defendant, and that the plaintiff is threatened with the destruction of a great many red cedar trees which are ornamental and of value as shade trees, as well as for other purposes. From the bill it appears that the plaintiff is the owner of a handsome country estate of over 2,000 acres, lying in Ashby magisterial district of Shenandoah county, Va., on which are hundreds of red cedar trees. On this estate the plaintiff annually raises and fattens several hundred thorough-bred cattle. The last of several attempts by the entomologist to enforce the Virginia Cedar Rust Law against the plaintiff is an order that the plaintiff destroy all cedar trees on two considerable parcels of plaintiff's estate, and that the plaintiff shall each year in the early spring remove all of the cedar balls from the numerous cedar trees growing on a described parcel of land of 20 acres surrounding the principal dwelling on the estate.

It is alleged that the Cedar Rust Law was duly adopted in Ashby district in 1916, but that it has not been readopted since the amendment of 1920. It is stated that all the cedar trees included in the last notice given by the entomologist are more than one mile from any orchard, and consequently not embraced by the original act. It is also contended that the act as amended in 1920 does not apply for want of adoption in Ashby district since that amendment.

The prayers include the broadest possible injunctive relief against efforts by the entomologist to enforce the statute.

While the bill prays for a preliminary restraining order, no motion therefor was made. On February 8, 1926, the entomologist filed a motion to dismiss and an answer, and the case came on to be heard on February 25th on plaintiff's motion for an interlocutory injunction and on the defendant's motion to dismiss. At that time the parties each filed sundry affidavits, and since then they have each filed additional affidavits. So far as may be necessary, the purport of the defendant's pleadings and of all of the affidavits will be stated in the course of the following discussion.

### The Amount in Controversy.

If the matter in controversy here is the validity of the Cedar Rust Law, and if there-

fore the value of this statute to the apple orchardists and the public is the value of the matter in controversy, there can be no doubt as to the pecuniary jurisdiction of this court. If the matter in controversy is only the preservation or destruction of the orchards within two miles of the infected cedar trees in litigation, the value of this matter is well above $3,000. If the matter in controversy is merely the right which the plaintiff asserts and seeks to have protected, still we believe that the value of the matter in controversy is sufficient to give this court jurisdiction. In estimating the pecuniary value of this right, we see no sound objection to the method that has been adopted by the witnesses on both sides. The ascertainment of the loss in market value of the plaintiff's estate which would result from compliance with the entomologist's orders seems a proper and practical method of ascertaining the value of the right asserted.

Beyond question there would be some loss if the plaintiff complied with the order to destroy, but the evidence leaves us in great doubt as to the amount. In respect to the order to treat the cedar trees on the 20 acres, however, we are not in doubt. If the statute is valid, this requirement is perpetual, and can be avoided only by destroying all of the infected cedar trees on this parcel. We are satisfied that the preponderance of the evidence is that the destruction of these trees would diminish the value of the estate by more than $3,000. And a perpetual annual obligation to perform the duty of treating these trees, which runs with the land, could be a very serious incumbrance. The affidavits filed in behalf of the plaintiff do not go into the extent of this task in detail, but it could be onerous and very expensive; and numerous intelligent and apparently disinterested witnesses have testified that an obligation to comply with the order to perpetually treat the cedar trees on the 20 acres would diminish the value of the estate by much more than $3,000. We regard this conclusion as supported by the preponderance of the evidence.

### The Motion to Dismiss.

We find no merit in any of the grounds assigned in support of the defendant's motion to dismiss, and, in view of the conclusions we have reached on the merits of the case, we think it quite unnecessary to discuss the motion to dismiss.

### The Plaintiff's Motion for an Injunction.

(A) Vexatious litigation:

We do not find in the evidence support for the assertion that the entomologist has been guilty of harassing the plaintiff with vexatious litigation. The agents employed by the entomologist have exhibited regrettable carelessness. The first proceeding was based on a request in writing, made by persons, some of whom were not freeholders, and the notice to destroy embraced cedar trees more than two miles from any orchard. In the second proceeding, which excluded the cedar trees within 800 feet of the dwelling, this last mistake was again made. Such errors are not readily excusable, but they do not support the charge of an intent to harass the landowner with merely vexatious litigation. On the other hand, we think the evidence now before us shows that the entomologist seeks only to perform his duty under the law, and in such way as to do the least possible injury to the plaintiff.

(B) The adoption of the law:·

[1] The statute, section 893, authorized counties and magisterial districts of counties to adopt or reject the Cedar Rust Law. In 1916 the original statute was duly adopted in Ashby district. In 1920 the first section of the original act was so amended as to change the distance from one to two miles. There has been no subsequent adoption of the statute in Ashby district.

The cedar trees included in the last notice given by the entomologist lie within two miles of some orchard, but not within one mile of any orchard. The plaintiff contends that the original statute did not authorize the destruction or the compulsory treatment of cedar trees standing more than one mile from any orchard. For the sake of complete argument, we shall for the time being assume that such is the proper construction of the original statute.

The optionary power given the counties and districts to adopt or reject the law relates in express terms only to the original statute. Nowhere is there the slightest suggestion that the Legislature intended to abdicate its power of amendment, or of an intent to give the county authorities a right to adopt or reject future possible amendments of the law. In the act of 1920 also there is complete absence of indication of an intent that the counties and districts which had adopted the original act were given the power to adopt or reject the law as amended. And the silence of the amending act is itself

strong evidence that no such power was intended to be given.

If a statute requiring the destruction or treatment of cedar trees within two miles of any orchard is a reasonable exercise of the police power, the question here is, we think, one solely of the legislative intent. If the original statute had in both the first and second sections mentioned only a radius of one mile, and had otherwise been expressed as it was expressed, we can think of no constitutional provision which would make invalid an amendment making the radius two miles and expressly providing that the amendment should apply in districts which had previously adopted the original statute, without further action by the county authorities. The legislative act of grace, in making the application of the original act optional, could by no possibility, in and of itself, destroy the legislative power to thereafter make laws without regard to the wishes of county authorities. And this power necessarily includes the power to amend existing laws, also without regard to the wishes of county authorities.

(C) The intent of the original statute:

[2] However, we cannot agree that the learned counsel for the plaintiff are justified in their construction of the original statute. A reading of the first two sections of the statute (sections 885 and 886, supra), reveals a discrepancy which is explicable only as a slip of the pen. The danger zone is (once) stated as one mile in the first section, and it is (twice) stated as two miles in the second section. This fact alone makes the probabilities that the error was in the first section twice as great as that it was in the second section. Moreover, the fact that in 1920 the Legislature so amended the first section as to change the words "one mile" to "two miles," and left the second section unchanged, makes it a practical certainty that the error was in the first section.

The first section of the statute is unimportant. If the Legislature had the power to order the destruction of any cedar trees, a declaration by the Legislature that such trees constitute a nuisance could add nothing to its power and could not otherwise be of importance. On the other hand, the second section is of the utmost importance. In it the limits of the entomologist's duty and the limits of his power are stated. The reasonable probabilities are that, in case of a discrepancy between a very important section and a very unimportant section of a statute, the error has occurred in the latter.

Another strong ground for reading the original statute as applying to cedar trees within two miles is found in the unanimous testimony of the scientists who have testified in this case to the effect that the danger zone is two miles and not one mile. It may be added that the much more recent West Virginia Cedar Rust Law fixes a limit of three miles. Acts 1925, c. 84.

In the case of Bowman v. Virginia State Entomologist, 128 Va. 351, 371, 105 S. E. 141, 12 A. L. R. 1121, the cedar trees in controversy were all within one mile of an orchard, and it was agreed by counsel that the radius intended in the second section of the act was one mile. In the instant case the counsel for the entomologist make no such concession, and call attention to the fact that the question was of no importance in the Bowman Case.

We do not understand that it is contended that the Shenandoah county authorities adopted the law under the belief that the statute applied to cedar trees only within one mile of an orchard, and there is no evidence whatever in support of such contention. However, in passing, it may be noted that the statute gave no county a right to do more than to adopt or to reject. No power was given to adopt the statute subject to a condition that it should bear some particular construction.

It may here be further said that the statute gives no county or district which has adopted the law any power to revoke the adoption.

(D) The constitutionality of the statute:

[3] In 1920 the Virginia Supreme Court of Appeals (Bowman v. Virginia State Entomologist, 128 Va. 351, 105 S. E. 141, 12 A. L. R. 1121) held the Cedar Rust Law to be a valid exercise of the police power of the state. In that opinion objections that the statute is obnoxious to the due process and the equal protection clauses of the Fourteenth Amendment are discussed, and many other decisions in more or less similar cases are cited. While we regard the opinion in the Bowman Case as well reasoned, it is in respect to the federal constitutional questions merely persuasive, and the plaintiff is entitled to have the independent judgment of this court as to these questions.

(1) It is contended that the statute is void because of the provision (sec. 886) in respect to the written request of ten freeholders to the entomologist. Without so deciding, it may be assumed that counsel for plaintiff are right in saying that such request is an absolute prerequisite to a notice from the entomologist to the landowner to

destroy any cedar tree. However, it does not seem to us to follow that the statute either denies due process of law or the equal protection of the laws. The freeholders are not given any power themselves to order the destruction of cedar trees, nor can they control the entomologist in the performance of his duties, or the circuit court of the county in the exercise of its functions.

The power given is only that of putting the entomologist under the duty of making or of having made an examination. The difference between this power, and a power to condemn or power to require the entomologist to condemn, is most obvious. Hence we cannot concur in the conclusion of counsel for the plaintiff that the plaintiff's rights are determined by irresponsible individuals. So long as a request is not signed by ten freeholders, the owner of cedar trees remains undisturbed. And the signing of a request does not determine anything except that at least ten freeholders desire that an official search for infected cedar trees be made in some designated territory. The provision in question tends to protect the owners of cedar trees from possible official overzealousness, as well as the orchardists from the ultimate payment of damages and expenses, incurred by the possibly unnecessary destruction of cedar trees. While the provision seems to us wise and beneficent, it is at least harmless in respect to the owners of cedar trees. If it had been omitted, the remainder of the statute being as it is, infected cedar trees, within two miles of an orchard, in a district which had duly adopted the law, would be quite as liable to destruction as they are now. And, if the statute without the provision as to the written request would be constitutional, we are entirely unable to see why the provision in question makes the statute unconstitutional.

This statute differs so widely from the ordinance involved in Eubank v. Richmond, 226 U. S. 137, 33 S. Ct. 76, 57 L. Ed. 156, 42 L. R. A. (N. S.) 1123, Ann. Cas. 1914B, 192, and from the statutes in the other cases cited by counsel for plaintiff, that we think it profitless to discuss those cases.

[4] (2) It is further contended that the indefiniteness of the word "locality," as used in respect to the written request to the entomologist, invalidates the statute. A reasonable construction of the statute as a whole (see section 893) requires that the signers of any request to the entomologist must own estates of freehold in the county, or district, as the case may be, which has adopted the law, and in which are both the orchard or or-chards to be protected and the cedar trees to be examined. While the expression (section 886), "the locality from which said request is received," is not a happy one, it means merely the locality to which the request relates, and does not mean that the freeholders who sign must reside in, or must own estates lying in, any particular "locality." If this is, as we believe, a proper reading of the statute, there is no necessary indefiniteness in the statute, nor does it authorize a request which is in any respect indefinite. The request need not relate to a "locality" or to any undescribed territory. It can, and should, describe with all necessary accuracy and certainty, either the land to be examined, or the orchard or orchards, within a radius of two miles from which is the land to be examined. And a notice which does not thus reasonably specify the land to be examined could legally be disregarded by the entomologist, or could be successfully attacked by the owner of cedar trees on appeal to the circuit court. As there is no uncertainty of meaning as to who are freeholders of Ashby district, and as the statute does not authorize a request which leaves uncertain the territory to be examined, we think it unnecessary to further discuss this objection to the statute.

(3) In addition to the foregoing objections, counsel for the plaintiff attack the statute as a whole as depriving the plaintiff of property without due process of law and of the equal protection of the laws.

[5] It appears from the evidence that cedar rust is a fungus disease of apple trees, which cannot propagate unless there are trees of the juniper family of conifers in the vicinity of fruit trees of the pome family. Red cedar trees and apple trees of the best commercial varieties are particularly well adapted to the propagation of this disease. The balls which grow on the infected red cedar tree produce in the spring millions of spores, which, when carried by the wind to any one of many most valuable varieties of apple trees, cause the cedar rust on the fruit and especially on the leaves of the apple tree. This rust produces another spore while on the apple tree. The latter spore, if carried by the wind to any uninfected red cedar tree, infects it, and causes a production on the cedar tree of the cedar balls, which make the first-mentioned spores. The weight of the evidence clearly is that infected cedar trees within two miles of an apple orchard are from the first injurious, and in a few years are fatal, to the orchard. It also appears that, unless the cedar balls be removed early in the spring of each year from the

infected cedar trees, there is no remedy for the cedar rust disease except the destruction of the infected cedar trees. Moreover, an infected cedar tree is not merely dangerous to apple trees within two miles of such cedar tree. If the infected cedar tree infects an orchard, this orchard will infect previously uninfected cedar trees, and thus this dangerous disease is widely disseminated.

Some of the conflict in the affidavits is explicable by the fact, observed by the scientists and perhaps not observed by some of the lay witnesses, that there is a very much greater infection of the apple trees in wet seasons than in dry seasons.

In the affidavit of Prof. Schneiderhan, it is said that Virginia ranks third in the production of commercial apples and first in losses from cedar rust. In the affidavit of W. P. Massey, secretary of the Virginia Horticultural Society, it is said that over $20,000,000 are invested in apple orchards in this state. In numerous affidavits it is shown that the apple growing industry in this state is of great economic importance.

It seems that the red cedar tree is not itself injured by becoming the host plant of cedar rust. It becomes infected, but not diseased. In addition, such trees are, at least by some people, regarded as ornamental. They have some (if rather slight) commercial value; and they are certainly useful to the landowner for making posts and poles and as furnishing protection to cattle from the sun and the flies in summer and from storms in winter. It follows that the statute here in question is not exactly analogous to those statutes which require the destruction of noxious weeds and of infected and valueless fruit trees and animals. However, the clear preponderance of the evidence is that infected red cedar trees, if not treated, which are within two miles of unobstructed space of an apple orchard will not only injure, but will destroy, the orchard. It clearly appears that in the apple growing sections of this state the value of infected cedar trees to their owners and to the public is very much less than the value of the threatened orchards to their owners and to the public. In fact, we concur in the belief that the public interest in infected red cedar trees is rather insignificant in comparison with the public interest in the endangered apple orchards. Bowman v. Virginia State Entomologist, 128 Va. 371, 105 S. E. 148, 12 A. L. R. 1130. Directly and indirectly commercial apple production furnishes profitable employment to great numbers of people. While the owners of apple orchards in magisterial districts which have adopted or may adopt the statute are directly benefited by the destruction or treatment of infected cedar trees, it is certain that many other people are also thereby indirectly benefited. Presumably the public welfare was the object the lawmakers had in view, and the evidence before us does not support a belief that such was not the object.

All property rights are held subject to the fair exercise of the power to make regulations that are reasonably necessary to secure the welfare of the community. If the regulation be not capricious, arbitrary, or unjustly discriminatory, and if the means employed have a real relation to the ostensible purpose, the statute may be a valid exercise of the police power. See Samuels v. McCurdy, 267 U. S. 188, 194, 199, 45 S. Ct. 264, 69 L. Ed. 568, 37 A. L. R. 1378; Kansas City Ry. v. Road District, 266 U. S. 379, 386, 45 S. Ct. 136, 69 L. Ed. 335; Reinman v. Little Rock, 237 U. S. 171, 177, 37 S. Ct. 511, 59 L. Ed. 900; Atlantic Coast Line v. Goldsboro, 232 U. S. 548, 558, 34 S. Ct. 364, 58 L. Ed. 721.

[6] The fact that only one class, the owners of infected red cedar trees, are injured by the statute does not deny the equal protection of the laws, since all such owners are equally subject to the law. See Terrace v. Thompson, 263 U. S. 197, 218, 44 S. Ct. 15, 68 L. Ed. 255; Cotting v. Kansas City Stockyards Co., 183 U. S. 79, 112, 22 S. Ct. 30, 46 L. Ed. 92; Norfolk County Water Co. v. City of Norfolk, 246 F. 650, 158 C. C. A. 606. Again, the fact that only one class, the owners of apple orchards, are the direct beneficiaries of the law, does not prevent it from being indirectly of wide public benefit. In the situation caused by the cedar rust disease, the public could be benefited only by benefiting the apple orchardists. It may be added that almost every statute which for the public good requires the destruction of diseased vegetation or of diseased animals is of more immediate and more direct benefit to some class than it is to the community generally.

It is argued that the statute is unreasonable, in that it authorizes the destruction of cedar trees, which may be of much value, without regard to the value of the orchard or orchards within the two-mile limit. This argument ignores the fact that a valueless orchard may, if infected cedar trees infect it, become a new focus of infection and thus aid in spreading the disease into theretofore uninfected localities.

Because of the nature of cedar rust, commercial apple orchards cannot exist in close

proximity to infected red cedar trees. This fact, at least in some sections, made an election between the destruction (or treatment) of infected cedar trees and the ruin of the orchards an unavoidable necessity. We are impressed by the belief that the Legislature has made this election justly and in the interest of the public welfare. In the statute we find nothing that seems to us to be arbitrary or unreasonable.

Considerable support of the reasonableness of the Virginia statute is furnished by the fact that Arkansas (Crawford & Moses' Digest, §§ 8027, 8029; Howard v. State, 154 Ark. 430, 242 S. W. 818), New York (Cahill's Consol. Laws, p. 682), and West Virginia (Acts 1925, c. 84) have adopted somewhat similar statutes. In the affidavit of the defendant it is said that Pennsylvania and Illinois have also adopted such statutes, but we have not had access to these enactments. [7] It should be said in conclusion that the courts have no power to declare a statute unconstitutional unless it is clearly so. Dartmouth College v. Woodward, 4 Wheat. 518, 625, 4 L. Ed. 629; Von Hoffman v. City of Quincy, 4 Wall. 535, 549, 18 L. Ed. 403; Legal Tender Cases, 12 Wall. 457, 531, 20 L. Ed. 287; U. S. v. Gettysburg, etc., Ry. Co., 160 U. S. 668, 680, 16 S. Ct. 427, 40 L. Ed. 576; Booth v. Illinois, 184 U. S. 425, 431, 22 S. Ct. 425, 46 L. Ed. 623; U. S. v. Mc-Cullagh (D. C.) 221 F. 288, 290. And we are entirely unable to say that the statute here in question is clearly unconstitutional.

It follows that the plaintiff's motion for an interlocutory injunction must be overruled.

PER CURIAM. This cause coming on to be heard upon the application of plaintiff for an interlocutory injunction to restrain the enforcement of a statute of the state of Virginia, and being heard before the undersigned three judges composing a court constituted according to statute, and defendant having moved to dismiss the bill of complaint, and this motion of defendant and the application of plaintiff having been heard upon the pleadings and affidavits and the argument of counsel:

Now therefore, for the reasons set forth in the opinion of the court, written by Judge McDOWELL and concurred in by Judges PARKER and GRONER, it is ordered, adjudged, and decreed (1) that the defendant's motion that the bill of complaint be dismissed be, and the same is hereby, overruled; and (2) that the plaintiff's application for an interlocutory injunction be, and the same is hereby, denied.

JOHN J. PARKER,
 U. S. Circuit Judge for the Fourth Circuit.

HENRY C. McDOWELL,
 U. S. District Judge for the Western District of Virginia.

D. LAWRENCE GRONER,
 U. S. District Judge for the Eastern District of Virginia.